******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ESPINOSA, J., dissenting. In the present case the defendant, Enrique Ayala, was convicted of three counts of interfering with an officer in violation of General Statutes § 53a-167a, in connection with his conduct in a single criminal transaction that in its entirety lasted less than one hour, beginning when he intervened in a motor vehicle stop and ending approximately 1000 feet away in a holding cell at the Meriden police station. The question of whether the defendant interfered with the officers in the holding cell at the police station was thoroughly addressed by both parties during trial. With each of its witnesses, the state forcefully and consistently advanced its theory that the defendant's interference with the officers began at the motor vehicle stop and continued at the police station. Defense counsel meticulously and effectively attempted to parry the state's arguments by presenting the theory that the defendant cooperated with the police officers during the entire sequence of events, despite their alleged assaults on his person. I disagree with the majority, therefore, that the state's amended information in any way deprived the defendant of notice, charged him with an additional offense or prejudiced him. I conclude, to the contrary, that the amendment merely conformed the information to the evidence adduced at trial. I would hold that the Appellate Court improperly concluded that the trial court abused its discretion in allowing the amendment. *State* v. *Ayala*, 154 Conn. App. 631, 656, 106 A.3d 941 (2015). Accordingly, I respectfully dissent.

This court has explained that Practice Book § 36-18 "is primarily a notice provision. Its purpose is to ensure that the defendant has adequate notice of the charges against which he must defend. *State* v. *Jacobowitz*, 182 Conn. 585, 590, 438 A.2d 792 (1981) [overruled in part on other grounds by *State* v. *Welch*, 224 Conn. 1, 4, 615 A.2d 505 (1992)]." *State* v. *Tanzella*, 226 Conn. 601, 608, 628 A.2d 973 (1993). Specifically, § 36-18 safeguards a defendant's sixth amendment right "to be informed of the nature and cause of the accusation . . . ." U.S. Const., amend. VI. "For purposes of § [36-18], [therefore] the decisive question is whether the defendant was informed of the charges with sufficient precision to be able to prepare an adequate defense." *State* v. *Tanzella*, supra, 608.

The question of whether the information provided the defendant with sufficient detail to enable him to prepare an adequate defense is a pragmatic one. The analysis properly should begin with a review of the original information and then proceed to an examination of the record to determine whether the parties evinced an understanding of the charges that supports the conclusion of the trial court that the amendment

did not constitute an unfair surprise that deprived the defendant of notice. That review reveals that the defendant *did* have sufficient notice of the details of the charges to enable him to mount a defense.

It is significant that the original information charged the defendant not only with three counts of interfering with an officer in violation of § 53a-167a (a), but also with assault of public safety personnel, specifically a peace officer, in violation of General Statutes § 53a-167c (a) (1). As the majority explains, during voir dire, the prosecutor noticed that the information incorrectly stated that the assault occurred at the site of the motor vehicle stop rather than at the police station, and requested to amend the information to correct the error. That amendment was allowed without objection from the defendant and he does not challenge that amendment in this appeal. It is therefore undisputed that the state was required to prove that the defendant assaulted a peace officer at the police station. A person is guilty of assaulting a peace officer when, "*with intent to prevent a reasonably identifiable peace officer . . . from performing his or her duties*, and while such peace officer . . . is acting in the performance of his or her duties . . . such person causes physical injury to such peace officer . . . ." (Emphasis added.) General Statutes § 53a-167c (a) (1). A person is guilty of interfering with an officer when "such person obstructs, resists . . . [or] hinders . . . any peace officer . . . in the performance of such peace officer's . . . duties." General Statutes § 53a-167a (a). It is readily apparent that there is substantial overlap between the elements of both offenses. Most significantly, in order to prove an assault of a peace officer, it is not sufficient for the state to prove that the defendant caused physical injury to the officer—the state must also prove that, in doing so, the defendant's intent was to prevent the officer from performing his or her duties. The information, therefore, placed the defendant on notice that, in order to prove an assault against a peace officer, the state was required to prove that—*at the police station*—the defendant acted with an intent to prevent Officer Margaret Smusz—the officer who the defendant allegedly assaulted—from performing her duty.

Unsurprisingly, in order to prove that the defendant intended to prevent Smusz from performing her duty, the state elicited detailed testimony from each of the three officers involved regarding the defendant's resistance at the police station, making clear that its theory was that the defendant interfered with the police officers during the entire sequence of events, including those that occurred at the police station. During its examination of the officers, the state used the video recording of the events that took place at the police station, reviewing the video in great detail to support its theory that the defendant was resisting the officers in the holding cell. Specifically, the state elicited testimony

from the officers that in the holding cell at the police station, the defendant physically and verbally resisted when they tried to remove his motorcycle club vest. The officers testified that the defendant responded to their attempts by stating, "fuck you, pigs," and "fuck you, you're not taking my colors." When the officers released the defendant from his handcuffs so that they could remove the vest, rather than keeping his hands behind his back as ordered, the defendant brought his arms forward, compelling the officers to contain him by pinning him against the wall in the corner of the holding cell. The officers then brought the defendant to the ground in order to place the handcuffs back on him. There were four officers on top of the defendant at that point, but he continued to resist. The defendant was facedown on the floor, and had locked his hands under his chest. The officers instructed him to place his hands behind his back, but the defendant refused to comply, and was kicking with his feet. Officer David Buck testified that he attempted unsuccessfully to use compliance techniques to make the defendant stop struggling, including pressure point techniques. When Buck's efforts failed to force the defendant to comply, he used a Taser to administer a "dry stun" to the defendant. Despite being stunned by the Taser, the defendant continued to resist the officers as they tried to place the handcuffs on him.

Defense counsel did not object to the state's line of questioning regarding his resistance to the officers in the holding cell at the police station as irrelevant, and instead cross-examined each of the three police officers at great length regarding whether the defendant complied with the officers' orders at the police station. For instance, with respect to the events at the police station, the majority of defense counsel's cross-examination of Buck, rather than targeting the alleged assault, focused on the alleged acts of interfering. Defense counsel used the police department video of those events to bring out the defense theory that, rather than resisting police, the defendant complied with their instructions. Throughout the cross-examination of the officers, counsel sought to demonstrate the defense theory that the defendant's motions were passive in nature—merely responses to being moved around by the officers.

Defense counsel painstakingly reviewed the video with Buck, emphasizing every instance in which the defendant appeared to be cooperating with the officers. Counsel began by calling Buck's attention to the beginning of the video, which showed the cruiser arriving in the sally port at the police station, and the officers removing the defendant from the cruiser. After playing that portion of the video, counsel asked Buck whether at that point in time it appeared that the defendant was cooperating. Buck answered in the affirmative. At one point in the video, it appeared that the defendant was being led into a room, and then led back out of it.

Defense counsel questioned Buck about that sequence, asking whether he agreed that the defendant was "not resist[ing]" at that time. Buck agreed with that characterization. Defense counsel then called attention to the fact that when the officers brought the defendant into the holding cell, Officer Shane Phillips kicked the defendant's legs wide apart. Defense counsel then asked: "[I]s it safe to say that there is no resistance or problem at this point?" Buck responded that the defendant was not offering any physical resistance at that time. As the activity captured on the video further unfolded, defense counsel asked Buck whether the defendant was complying as the officers began to remove the defendant's clothing. Buck responded in the affirmative. Defense counsel then elicited testimony from Buck that, when the officers began to remove the defendant's handcuffs, the defendant appeared to be compliant.

Counsel also elicited testimony from Buck that supported the defense theory that the defendant's movements, as seen in the video, did not constitute resistance, and instead were involuntary responses to being physically handled by the officers. Specifically, Buck testified on cross-examination that when the officers spread the defendant's legs apart, the purpose was to put him off balance. Counsel also unsuccessfully attempted to elicit testimony from Buck that, at one point during the video, the defendant was being pulled in one direction by one officer and in a different direction by another officer, suggesting that the officers were placing him off balance. Defense counsel also asked Buck whether, when the defendant brought his arms forward, it was not for the purpose of resisting the officers, but in order to protect his face from getting smashed into the stone wall of the holding cell.

Defense counsel also directly challenged some of the testimony that the state elicited in support of its theory that the defendant interfered with officers in the holding cell. For example, Buck had testified that the defendant crouched down at one point in the holding cell. Defense counsel called that testimony into question by eliciting testimony from both Smusz and Phillips to the contrary. Defense counsel used the video itself to challenge the officers' statements that the defendant had swung his arms, pointing out during questioning that the video showed that the officers were holding the defendant's right arm.

During the direct examination of the defendant, defense counsel further developed the defense theory that the defendant did not interfere with the officers in the holding cell at the police station. In connection with the events at the station, defense counsel expressly asked the defendant: "*So you weren't interfering with them?*" (Emphasis added.) The defendant responded that he was not, because he did not want to provide the officers with an excuse to physically abuse him.

The defendant's position was that during the entire evening, he cooperated with the officers because he believed that the more compliant he was, the sooner he would be able to post bond and be released. For example, the defendant testified that in the holding cell, he voluntarily assumed a stance with his legs wide apart and that, when the officers unlocked his handcuffs, he kept his hands behind his back. He also denied making any derogatory statements to the officers during this time. When the officers threw him against the wall, the defendant said, he "just stayed there." When Smusz was going through the defendant's pockets, he leaned one way, then another, to make it easier for her to reach into his pockets. The defendant further testified that when Buck warned him not to move, the defendant responded, "listen, I'm not—I'm not trying to resist. Officer Phillips is pulling me one way; you're pulling me the other way; I can't go both ways." The defendant denied objecting to the removal of his vest, and denied that he resisted when the officers removed the vest.

The defendant's testimony reiterated the same theory that the defense had presented in the cross-examination of the police officers: that his movements were simply a response to being placed off balance and being pushed and pulled by the officers. He testified that because he was placed in a wide-legged stance, at one point he lost balance, which prompted the officers to pin him into a corner of the holding cell. He emphasized, however, that he did not fight with or struggle with the officers in any way.

The defendant was clearly on notice that he had to defend against the state's allegation that he had interfered with the officers during the course of his actions on the morning of his arrest. The information's charge that he assaulted a peace officer at the police station placed him on notice that he would have to defend against the allegation that, at the police station, he acted with an intent to prevent Smusz from performing her duties. The line of questioning pursued by the state during the direct examinations of the three police officers methodically aimed to demonstrate that the defendant interfered with the officers in the holding cell at the police station. Defense counsel's questions of those same witnesses during cross-examination, and his questions of the defendant during direct examination, sought to dispute the state's theory, and to suggest an alternative interpretation of the defendant's movements in the video: that they were passive responses to the officers' physical handling of him rather than acts of interference.

Perhaps the best demonstration that the defendant was on notice that the evidence presented by the state in support of its charge that the defendant assaulted Smusz at the police station also supported the state's theory that the defendant interfered with the officers

at the police station was defense counsel's motion, filed one day before counsel claimed that the amended information was an "unfair surprise." That motion asked the court to instruct the jury not to consider that evidence in connection with the interfering charges. Specifically, counsel pointed out that the original information did not state that the interfering conduct occurred both at the motor vehicle stop and at the police station. Counsel acknowledged his awareness that the evidence could support the determination that the defendant had interfered with the officers at the police station, by asserting that the "testimony about the defendant's cooperation or lack [thereof] while detained at the Meriden Police Department may confuse the jury as to [whether] the several counts of interfering with an officer apply to interfering while being detained at said department . . . ." The following day, the court summarized a prior off-the-record discussion, noting that the state intended to argue that the defendant's interfering conduct that began at the motor vehicle stop and continued at the police station constituted a "continuing course of conduct . . . ." In light of this sequence of events, the state's subsequent amendment to the information reasonably may be read to have sought to conform the charges to the evidence. *State* v. *Franko*, 199 Conn. 481, 492, 508 A.2d 22 (1986).

Because the defendant had notice, he was not prejudiced by the amendment. Defense counsel's cross-examination of the officers was thorough and well executed. The defendant's testimony provided further support for the defense theory that the video, rather than demonstrating that the defendant was interfering with the officers in the holding cell, showed that he was doing his utmost to comply with their instructions. The majority cannot point to any avenue of questioning that the defendant left unexplored. The sole ground upon which the majority bases its conclusion that the defendant was prejudiced was that he elected to testify. The majority, however, offers no explanation as to why the defendant might have made a different decision if the state had amended the information prior to his testimony, and makes no credible claim that the defendant's testimony hurt his case. Instead, rather than providing even a single detail explaining how the defendant's testimony caused him any prejudice in light of the amended information, the majority simply relies on its speculation that the defendant *could have* decided, in light of the change, not to testify. The defendant's testimony served the purpose of placing the defense theory squarely in front of the jury. Contrary to the accounts of the police officers that the defendant had consistently interfered with them, the defendant testified that he had been cooperative throughout the entire encounter, during which he was the victim of repeated assaults, verbal and physical, by the police officers. His testimony, therefore, asked the members of the jury to view

the sequence of events in an entirely different light. That testimony, therefore, was a key part of the defense strategy, both as to the interfering counts and as to the assault charge.

As I have explained in this dissenting opinion, the defendant testified extensively regarding the events that took place at the police station—and that testimony emphasized the defense theory that I have discussed, that he was the victim of abusive conduct by the police. Until the amendment, of course, the defense's focus on the events in the police station were related to the felony assault charge. The amendment to the information meant that the very same facts that had been heavily litigated by the parties in connection with a *felony* charge now were also relevant to the already existing *misdemeanor* charges. The majority hangs its conclusion that the defendant was prejudiced by the amendment on the bizarre notion that the defendant, undeterred from taking the stand by the prospect of liability for a felony assault, would have changed his strategy and not taken the stand because he now faced liability for misdemeanors in connection with the events at the station. The majority ignores the fact that the purpose of Practice Book § 36-18 is to safeguard a defendant's right to be provided with notice of the charges "with sufficient precision to be able to prepare an adequate defense." *State* v. *Tanzella*, supra, 226 Conn. 608. The amendment did not subject the defendant to any additional criminal liability. That is, no new counts were added to the information, and the amendment simply clarified that the state's theory was that the defendant interfered with the officers during the entire course of events, not merely at the motor vehicle stop.

I also observe that, although the majority suggests that the defendant might have elected not to testify in light of the amendment, the majority offers no explanation as to how the defendant's testimony was not relevant to his theory that he was not interfering with the officers at the station that night. To the contrary, his testimony regarding the events at the station, as I have summarized it here, was entirely consistent with defense counsel's cross-examination of the police officers. He testified that he believed that by cooperating with the officers and offering no resistance, he would shorten his ordeal, and that, because of that belief, he complied. The majority appears to suggest that the defendant's testimony during direct examination that he refused medical treatment somehow undercuts his claim that he did not interfere with the police officers in the performance of their duties. That testimony, however, relates to the defendant's interactions with an emergency medical technician, not to any of the three officers named in the interfering counts.

Defense counsel's response to the court's ruling

granting the state's motion to amend the information confirms that—despite counsel's statement that the amendment constituted an "unfair surprise"—the original information had provided the defendant with sufficient detail to allow him to mount his defense. Specifically, after the motion to amend the information was granted, the defendant did not call *any* witnesses back to the stand. If, as the defendant now claims, he lacked notice that he needed to defend against the allegation that he interfered with the officers at the police station, one would think that he would have needed to recall witnesses in order to question them regarding that issue. Clearly, defense counsel did not believe that doing so was necessary. My review of the transcripts leads me to the same conclusion that defense counsel apparently arrived at—he already had asked the witnesses all the relevant questions required to cast doubt on the state's claim that the defendant had interfered with the officers in the holding cell at the police station.

Because I conclude that the defendant had sufficient notice that the state's theory was that the interfering charges included his conduct at the police station, I conclude that the trial court did not abuse its discretion in allowing the amendment. It is therefore unnecessary for me to consider whether the record demonstrated good cause[1] for the amendment and whether the amendment charged a different or additional offense. *State* v. *Tanzella*, supra, 226 Conn. 608 and n.8. Because I disagree with the majority's conclusion that the amended information charged an additional offense, however, I briefly explain the basis for my disagreement with that conclusion.[2]

As I have observed in this dissenting opinion, the purpose of Practice Book § 36-18 is to protect a defendant's sixth amendment right "to be informed of the nature and cause of the accusation . . . ." U.S. Const., amend. VI. In light of that overarching purpose, this court has never rigidly construed the requirement that an amended information cannot charge an additional or different offense. Instead, the court has reviewed amendments with an eye toward determining whether the original information did not provide the defendant with notice of the "nature and cause of the accusation" that the state had brought against him. U.S. Const., amend. VI. For example, at issue in *Tanzella* were two amendments to the original information. *State* v. *Tanzella*, supra, 226 Conn. 606. First, the information had charged the defendant with assault in the third degree in violation of General Statutes § 53a-61 (a) (2), alleging that he recklessly caused serious physical injury to another person. That count was amended to reflect that the state alleged that the defendant intentionally caused physical injury to another person in violation of § 53a-61 (a) (1). Id., 607. Second, the original information had charged the defendant with threatening in violation of

General Statutes (Rev. to 1993) § 53a-62 (a) (2), alleging that the defendant had threatened to commit a crime of violence with the intent of terrorizing another or causing serious public inconvenience. That count was amended to reflect that the state alleged that the defendant, by physical threat, intentionally placed or attempted to place another person in fear of imminent serious physical injury in violation of General Statutes (Rev. to 1993) § 53a-62 (a) (1). Id. This court recognized that the amendments changed both the mental state and the nature of the harm. Id., 613. Because the amendments simply specified "alternative means of committing a single crime," however, the court concluded that they did not charge any additional or different offenses. Id., 612–13.

In contrast to the amendments in *Tanzella*, the amendments to the information in the present case merely clarify where the acts of interfering occurred. The amendments do not change the mental state or the nature of the harm. They do not change the identity of the officers with respect to whom the defendant was charged with interfering, and they do not change the elements of the offense. The amended counts of the information simply make clear what already had become obvious from the questioning by both parties during the trial—that both sides understood the defendant's interfering conduct to have begun during the motor vehicle stop and to have continued at the police station. Accordingly, rather than charging an additional or different offense, the amended information merely conformed the charges to the evidence.

The trial court ruled that the defendant's actions constituted what it referred to as a "continuing course of conduct." I understand the court's use of that phrase, which I acknowledge does not constitute a legal term of art in this particular context, to mean that it viewed the defendant's conduct at the police station and at the motor vehicle stop to comprise a single criminal transaction. That understanding is supported by the evidence adduced at trial, which revealed that from start to finish, the defendant's charged conduct lasted less than one hour; the motor vehicle stop occurred a mere 1000 feet from the police station; and, with the exception of a few pauses in his interfering conduct, the defendant persisted in his resistance to the police throughout the encounter. Specifically, the encounter began shortly after 1 a.m., when Buck initially stopped the defendant's girlfriend, Michelle Sofianos, after observing her making an illegal U-turn near the intersection of Orange and Hanover Streets in Meriden. At approximately 1:27 a.m., the cruiser, with the defendant inside, pulled into the sally port at the nearby police station. The defendant's alleged assault, which marked the end of the defendant's charged conduct, occurred approximately fifteen minutes into the video—about forty-five minutes after Buck stopped Sofianos. During

that time, the defendant interfered with the officers. The unity of the defendant's criminal conduct at the motor vehicle stop and the police station is not changed by the mere fact that while the defendant was interfering with the officers, they moved him to a different location. Nor is that unity defeated because the defendant did not physically resist during every single moment of those forty-five minutes. It is particularly significant that when the defendant was physically compliant, he was handcuffed, thereby preventing him from physically interfering. Of course, handcuffs could not stop the defendant from verbally interfering with the officers, and the officers testified that he did so. Phillips testified that after the defendant had been placed in handcuffs at the scene of the motor vehicle stop, he continued to be "verbally combative." Phillips explained that the defendant kept displaying "a lot of verbal aggression toward us, calling us pigs and using profanity toward us." Buck testified that in the sally port, the defendant, who was intoxicated, told the officers: "[F]uck you guys. Just leave me the fuck alone." When they brought him to the holding cell, Phillips testified, the defendant's ongoing verbal attacks on the officers continued. When questioned regarding what the defendant said, Phillips responded, "more expletives and calling us pigs."[3] The defendant's physical interference resumed almost immediately after they removed the handcuffs in order to remove his vest, and he resumed his compliance soon after they placed the handcuffs back on him. The testimony and evidence presented at trial, therefore, demonstrated that the defendant's interference was ongoing. His conduct at the police station was part of the same criminal transaction that began at the motor vehicle stop, and the state's amended information merely conformed the charges to the evidence adduced at trial.

I emphasize that the basis for my dissenting opinion is my conclusion that the original information provided the defendant with sufficient notice to defend against the charges. That ability to defend was not affected by the amendment to the information. He extensively and thoroughly challenged the state's position that he interfered with the officers at the police station. The cross-examination of the police officers, taken together with the defendant's testimony, presented a coherent defense theory, that the defendant was a victim of police abuse. If he had believed that he was prejudiced by the amendment, he could have recalled witnesses to the stand or introduced additional evidence. He did not. The majority's decision, by ignoring the fact that the defendant fully litigated this issue, gives the defendant a windfall.

For all of the foregoing reasons, I would conclude that the trial court did not abuse its discretion in allowing the amendment. Accordingly, I respectfully dissent.

[1] I note my agreement with the majority's acknowledgment that if the

record were to reveal that the state lacked good cause for seeking to amend the information, that alone would not support a conclusion that the trial court abused its discretion in allowing the amendment. I further observe, however, that because the amended information conformed the charges to the evidence, the record reflects that there was good cause for the amendment. See *State* v. *Franko*, supra, 199 Conn. 492. I therefore disagree with the Appellate Court's suggestion that in order for the record to establish good cause, there must have been "new evidence or evidence that the state had not anticipated to warrant amending the information at that time." *State* v. *Ayala*, supra, 154 Conn. App. 647.

[2] As I have explained, I ground this dissenting opinion on my conclusion that the original information provided the defendant with sufficient notice to mount a defense, and discuss the issue of whether the amendment charged the defendant with an additional offense solely to explain why I disagree with the majority that it does so.

As for the majority's claim that the state conceded this issue at oral argument, however, I disagree. It is at best unclear whether the state conceded this issue. At one point during argument, the state's attorney was comparing the present case with *State* v. *Tanzella*, supra, 226 Conn. 601. By contrast to *Tanzella*, the state's attorney argued, in the present case, "we have an added crime . . . and we have different conduct, but [he was] able to fully defend against that conduct." A few minutes later, however, the state's attorney expressed the opposite view. The Chief Justice asked: "You're not really disputing that this was an additional offense?" The state's attorney responded: "No, absolutely not. . . . *It is the same crime*, and what they provided was an additional separate evidentiary basis for the conviction. You can call it whatever you want." (Emphasis added.) This response is inconsistent with the majority's claim that the state conceded this issue.

[3] Because the defendant ceased to *physically* interfere with the officers after being placed in handcuffs, the majority incorrectly states that he was "fully cooperative . . . ." See footnote 8 of the majority opinion. The record demonstrates that the defendant merely adapted. When he was no longer able to offer physical resistance, he continued to resist the officers in the only means available to him—verbal interference. The interference was ongoing.